# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

NICOLE R. BOWMAN-FARRELL,
PAMELA W. KUCK, and
MARCIA WITTROCK

        Plaintiffs,

    v.                                     Case No. 02-C-818

COOPERATIVE EDUCATION SERVICE AGENCY 8,
ROBERT KELLOGG, and
MARGARET JONES

        Defendants.

---

## MEMORANDUM DECISION AND ORDER
## GRANTING MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiffs Nicole R. Bowman (hereinafter "Bowman"), Pamela W. Kuck and Marcia Wittrock, claim they are victims of unlawful retaliation by defendant Cooperative Education Service Agency 8 ("CESA 8"), a subdivision of a Wisconsin governmental agency that provides contract services for the school districts in the northeast part of the state; its administrator, Robert Kellogg; and former CESA 8 employee Margaret Jones. Wittrock is a current employee of CESA 8, and both Bowman and Kuck are former employees. All three plaintiffs allege they engaged in speech protected by the First Amendment and were retaliated against by CESA 8, Kellogg and Jones. Bowman and Kuck also claim they are victims of unlawful discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000 *et seq*. Bowman, who is Native American, claims she was subjected to adverse employment actions on account of her race, and both Bowman and Kuck claim

they suffered unlawful retaliation when they complained about the unlawful discrimination. Finally, Bowman and Kuck also claim CESA 8 and Kellogg infringed upon their equal protection and due process rights as well.

Although the case was filed in August 2002, Jones moved for a stay in early 2003 after her insurer was placed in court-ordered rehabilitation by the Pennsylvania Commissioner of Insurance. When neither the plaintiffs nor the other defendants objected, Jones' motion was granted, and the case was administratively closed. Plaintiffs' motion to lift the stay, filed in response to the court's inquiry concerning the status of the case, was granted on June 15, 2005, and the parties proceeded with discovery. The case is presently before me on the defendants' motions for summary judgment as to all claims against them. Finding no evidence to support any of the plaintiffs' claims, the defendants' motions will be granted.

## BACKGROUND

### I. The Parties

Defendant CESA 8 is one of twelve Cooperative Education Service Agencies created by the State of Wisconsin "to serve educational needs in all areas of Wisconsin by serving as a link both between school districts and between school districts and the state." Wis. Stat. § 116.01; *see also* Wis. Stat. § 116.01-10. Each agency serves a number of school districts within its region. CESA 8 has 26 member school districts from the northeastern part of the state, and like its sister agencies, is governed by a Board of Control ("BOC") composed of individuals who also serve as school board members for school districts within the region. *See* Wis. Stat. § 116.02(1). CESA 8's principal mission is to provide to school districts certain services that they cannot provide themselves. For

2

example, under its special education program, CESA 8 may employ an occupational therapist and then sell the therapist's services to several school districts within the region.

CESA 8 is organized by program/department, with each one having its own director. The number of program directors (a/k/a department heads) varies from year to year, depending upon the services CESA 8 offers, which, in turn, depends upon the school districts' level of interest in purchasing specific services. Member school districts purchase services through one-year contracts, which account for approximately 80% of CESA 8's annual revenue. The other source of funding for CESA 8 is state or federal grant programs or entitlement money. Because CESA 8's annual revenue depends heavily upon the purchasing decisions of its member school districts, it enters into one-year employment contracts with its program directors and teachers.

Defendant Dr. Robert Kellogg was the agency administrator for CESA 8 when the events underlying this case occurred, and apparently maintains that position to this day. CESA 8's program directors report to Kellogg. Defendant Margaret Jones began working for CESA 8 in 1983. She held several positions there, including Director of Staff Development. From July 1, 1998, until June 30, 2001, when her employment at CESA 8 was terminated, she was Director of Standards and Assessments.

In the early part of each calendar year, CESA 8 "non-renews" the contracts of its program directors and teachers, that is, provides them preliminary notice that their one-year contract will not be renewed.[1] (However, depending upon the availability of funding, a given employee's contract may very well be renewed later in the year.) Defendant Jones received such notice in early 2001,

_____

[1] This notice is provided in order to comply with the procedures set forth in Wis. Stat. § 118.24.

and shortly thereafter CESA 8 notified her that her employment contract would not be renewed at the end of the fiscal year due to member school districts' lack of interest in the program she directed (Standards and Assessments). In the spring of 2001, Jones resigned from CESA 8, effective at the end of the school year,[2] and took a position as an elementary school principal. Her last day of employment at CESA 8 was June 30, 2001.

Plaintiff Marcia Wittrock has been employed at CESA 8 since 1986 and continues to work there today. From 1986 through June 1998 she held the position of Program Support Teacher in CESA 8's special education program. Beginning July 1, 1998, she took over from Jones as Director of Staff Development. She resigned from that position, effective June 30, 1999, and then returned to the position of Program Support Teacher. Plaintiff Nicole Bowman was hired to replace Wittrock as Director of Staff Development. At the time of Bowman's appointment, the title of the position was also changed to Director of Professional Development. Plaintiff Pamela Kuck began working at CESA 8 in 1996 as Director of Instructional Technology. Bowman and Kuck, like Jones, were given notice of non-renewal in early 2001. Citing a lack of funds (stemming from school districts' lack of interest in the relevant programs), CESA 8 did not renew the contracts of Bowman and Kuck, and their positions, as well as Jones', were dropped for the 2001-2002 school year.

---

[2] The parties do not dispute that CESA 8 sent Jones a notice of non-renewal in early 2001, but plaintiffs contend the real reason Jones left CESA 8 was that she resigned, not that her program was being discontinued. (*See* Kuck Aff. [Dkt. # 94] ¶ 81, Ex. P.) However, the fact that Jones alerted Kellogg, several months *after* she received notice of non-renewal, that she would be taking a different position at the end of the school year does not change the fact that, from CESA 8's perspective, Jones' program was being discontinued. Moreover, in her deposition testimony, which plaintiffs highlight, Jones clearly indicates that her appointment at CESA 8 ended because her program lacked funding. (Kaiseta Aff. [Dkt. # 96, Part 8], Ex. F.)

4

## II. Underlying Events

### A. Facts Pertinent to Wittrock's Claims[3]

At the beginning of the 1998-1999 school year, Wittrock replaced Jones as Director of Staff Development at CESA 8. Wittrock's duties in that position included organizing and running two large in-service programs for teachers (known as the Northern Joint In-Service and the Southern Joint In-Service), assisting with the administration of a technology academy, preparing and scheduling summer classes for teachers, and providing other professional development services to member school districts who had purchased them. In September 1998, Wittrock informed Kellogg of her concern that she would be short-staffed when her assistant, Betty Kaliebe, went on maternity leave later that month. Kellogg devised a plan under which Kaliebe would continue to do some work from home, and assigned other support staff to assist Wittrock.

In October 1998, Wittrock complained to Kellogg that Jones was not helping her learn her new position. Jones indicated she was too busy with her own new position at CESA 8 to answer Wittrock's numerous questions. Kellogg believed Jones should focus her energy on her own new job, and told Wittrock to look to Kaliebe for help, as Kaliebe had significant experience in the Staff Development Department. If Kaliebe's help proved insufficient, Wittrock was to ask CESA 8's office manager for assistance.

In November 1998, Wittrock expressed to Jones a concern about the budget of one of the teacher in-service programs. The cost of the program was set by a committee on an anticipated per-attendee basis, and then school districts decided whether they wanted to have their teachers

---

[3] Some facts pertinent to Wittrock's claims are closely tied to facts pertinent to the other plaintiffs' claims, and thus are discussed in subsection B below.

5

participate at that price. However, CESA 8's Special Education Department had also contributed between $600 and $900 to the program, and Wittrock wanted to know whether that amount was credited back to the school districts on a pro rata basis. (Because this particular in-service had about 900 participants, the resulting "refund" would have been $1 per teacher or less.) Jones said no such refund or credit had been given.

Wittrock was bothered by this practice, which she later referred to as "double billing," and so she took up the matter with Kellogg. Although Wittrock and the other plaintiffs have made this "double billing" charge the centerpiece of their First Amendment retaliation claims, the plaintiffs do not clearly explain their concerns or cite many concrete figures. They cite no law or regulation the practice may have violated. In essence, however, Wittrock was upset that CESA was billing individual school districts for certain charges, even though those expenses had been at least partially defrayed by other sources such as grant money.

In response to Wittrock's concerns, Kellogg, who was relatively new to the agency administrator position, told Wittrock he would look into the matter with Sharon Quade, CESA 8's business manager. Quade informed Kellogg that CESA 8 had no policy regarding the practice, and Kellogg relayed that information to Wittrock. Kellogg also told Wittrock to check with other CESA's to see how they handled the issue. As described further below, the overwhelming impression one gleans from the record is that no one at CESA 8 (apart from the plaintiffs) found Wittrock's "double billing" concerns particularly troubling or worthy of further consideration. (Quade Aff., ¶ 9.)

Wittrock thought Jones had mismanaged other funds as well, specifically those related to the federal Eisenhower entitlement program. Certain member school districts had joined together

to form a consortium under this program, in effect pooling their allotted Eisenhower funds. Jones was the committee chair of CESA 8's Eisenhower consortium. (Jones Dep. at 20, 47.)[4] In her deposition, Wittrock stated that she thought Jones had mismanaged these funds in the following ways:

- Wittrock believed some money in the program had been spent during one year when it should have been carried over to the following school year. (Wittrock Dep. at 72.) Wittrock based this belief on the statement of a school official who thought there should be some carryover money present in the Eisenhower funds. (*Id.* at 72-73.) However, Wittrock has no documents or other evidence to support the charge that Jones misspent carryover money. (*Id.* at 73-74.) Nor did she know how much money was at issue.

- For purposes of administering the Eisenhower consortium funds, CESA 8 had divided its territory into three regions. (*Id.* at 82.) Classes were assigned to a given region in proportion to the region's Eisenhower budget. (*Id.* at 82-83.) Wittrock believed Jones had scheduled two more classes for the Southern region than was appropriate, and Wittrock subsequently fixed this problem. (*Id.* at 82, 85, 86, 190.)

- Wittrock was concerned that Jones was not charging all school districts participating in the consortium an equal administrative fee. (*Id.* at 90.) However, under the grant's parameters, CESA 8 was free to charge schools different administrative fees, although these fees could not exceed 5% for the entire consortium. (Quade Aff. ¶ 8.)

Wittrock contends Jones retaliated against her after she approached Jones with her concerns about the "double billing." For example, several weeks later, the two attended a meeting at which

---

[4] Complete deposition transcripts are attached to the Affidavit of Molly Zillig.

7

Wittrock felt Jones gave her the cold shoulder. (Wittrock Dep. at 45-47.) As further examples of Jones' retaliation, Wittrock contends Jones cut off verbal communication, interfered with her ability to discipline her assistant (Kaliebe), and reported things to Kellogg that led him to criticize Wittrock's work performance.

As to Jones' lack of communication, Jones and Wittrock had come to an agreement to communicate only via e-mail; apparently, this was done to allow Wittrock to ask questions of Jones without having Jones feel inundated. Jones felt Wittrock was asking her too many questions about how to run the Staff Development Department and about her management of funds, and she wished to focus on running her own department instead. Wittrock later complained that Jones refused to answer questions, but could identify only one question of hers that Jones had not answered. (Wittrock Dep. at 51-52.)

As to disciplining Kaliebe, Wittrock had learned from a co-worker that Kaliebe had been criticizing her, and wanted to talk to Kaliebe and monitor her to ensure that the criticism stopped. (Wittrock Dep. at 53, 55, 56.) Later, Wittrock effected the discipline she sought, that is, she spoke to Kaliebe and told her to "knock it off." (*Id.* at 56.) Jones' alleged role in interfering with Wittrock's disciplining of Kaliebe is unclear. (*See id.* at 56-57.) It is also noteworthy that Wittrock's subsequent evaluation of Kaliebe's job performance during this period was quite positive. (Kellogg Aff., Ex. G.)

Finally, Wittrock claims Jones retaliated against her by providing Kellogg with information that led him to criticize her. Around December 16, 1998, Jones sent Kellogg an e-mail in which she expressed concern that Wittrock had told a school administrator of the "double billing." (Kellogg Aff., Ex. C; *see also* Wittrock Dep. at 60.) Kellogg asked Wittrock if she and Jones could work out

8

the issue together. (Kellogg Aff. ¶ 35.) On January 5, 1999, Kellogg sent Wittrock an e-mail requesting a meeting to discuss several issues related to her work, including her work flow and schedule, interactions with other office personnel, and her work with outside entities. (Kellogg Aff., Ex. D.) At that meeting, held several days later, Kellogg expressed concern—in rather heated fashion, according to Wittrock—about Wittrock releasing information about alleged "double billing" to outside entities; Kellogg then let Wittrock tell her side of the story, at which time she denied leaking any such information and complained of her difficulties in working with Jones. (Wittrock Dep. 121, 123; Kellogg Aff. ¶ 37.) Jones was apparently present at this meeting while the "leak" was being discussed, and then was dismissed. (Wittrock Dep. at 122.) Kellogg and Wittrock also discussed such issues as Wittrock's failure to keep a calendar and the perception that Wittrock did not return phone calls or pay invoices in a timely fashion. (Kellogg Aff. ¶ 37.) Wittrock asked Kellogg if her job was in jeopardy, and he said he did not know. (Wittrock Dep. 151.) Kellogg told Wittrock she did not seem happy in her new position, and he suggested she talk to her former supervisor for support. (Kellogg Aff. ¶ 37.) Kellogg indicated he would monitor Wittrock's work performance for several months and give her a chance to catch up now that Kaliebe (Wittrock's assistant) was back from maternity leave. (*Id.*) Kellogg did not discipline Wittrock during the meeting or for the alleged "leak." (*Id.*)

Wittrock also claims she discussed (or alluded to) some of her concerns regarding Jones' alleged fiscal mismanagement in roughly half a dozen one-on-one conversations she had with officials from member districts. (*See, e.g.*, Wittrock Dep. 101-12.) For example, she told a school superintendent that she would have to use carryover money from a consortium budget to pay for one activity, and that his district was given more activities than the consortium budget could support.

9

(Wittrock Dep. at 101-03.) She informed another school district official of her concern about the "double billing" and asked for some guidance and feedback. (*Id.* at 109-10.)

After Wittrock made these statements to school officials and expressed her concerns to Kellogg, she claims to have suffered various forms of retaliation. Besides Jones' "cold shoulder" treatment described above, Wittrock learned from a co-worker that Kaliebe and Jones were saying negative things about her between January and February of 1999. (Wittrock Dep. at 140.) Wittrock herself did not hear these comments, nor does she know what was said. (*Id.*) As discussed above, Wittrock told Kaliebe to stop the negative comments (*id.* at 56); she also advised Kellogg that she and Jones would discuss how to resolve the gossip and negativity in the office, with Kellogg to facilitate the discussion. (Kellogg Aff., Ex. F at 7.) Another form of retaliation, according to Wittrock, was that CESA 8 withheld help from her department when Kaliebe was on maternity leave from September 9, 1998, through January 1999. (Wittrock Dep. at 124, 130.)

On May 25, 1999, Wittrock resigned from the position of Staff Development Director, effective at the end of the school year, to return to her former position of Program Support Teacher. On July 1, 1999, she returned to her position at CESA 8 as a Program Support Teacher and received the cost-of-living increase in pay that was awarded to all such teachers at that time. From July 1, 1999, through September 2000 Wittrock had little contact with Kellogg and filed no formal complaints. She remains employed at CESA 8 at the present time.

**B. Facts Pertinent to Bowman's and Kuck's Claims**

Bowman began her employment at CESA 8 in July 1999 as Director of Professional Development, replacing Wittrock. Kellogg had recommended that CESA 8 hire Bowman. During her first year of employment, Bowman did not make Kellogg aware of any significant conflicts with

10

co-workers or individuals she dealt with in the course of her duties. She also expressed a positive opinion of Kellogg, indicating in a January 2000 e-mail that she considered him "honorable and just." (Bowman Dep. at 43; Haase Aff., Ex. 1020 at 14.)

Sometime in the summer of 2000, Kuck heard Kaliebe tell Jones that Kaliebe was "sick of all this Indian shit." (Kuck Dep. at 24-25.) Kaliebe's comment was occasioned by an article on a Native American topic that Bowman had distributed, and it appears Bowman routinely distributed articles on Native American topics to CESA 8 staff. (*Id.* at 26-27.) According to Kuck, Jones said nothing at the time but "agreed" with the comment by nodding her head and smiling knowingly. (*Id.* at 25.) Kuck (for unknown reasons) reported the comment to Bowman, who then complained to Kellogg via e-mail about Jones' "racist actions" as well as other concerns she had regarding Jones.[5] (Kellogg Aff., Ex. M.) Kellogg asked Bowman to elaborate on her allegations in writing.

The next day, July 13, 2000, Bowman submitted a memorandum and chart detailing her complaints against Jones, which included allegations of denigrating conduct towards herself and disparaging statements about co-workers and Native Americans. (Kellogg Aff., Ex. L.) In Bowman's view, it was not pure racism that motivated Jones but "white privilege," a sociological concept describing a dynamic or system of institutionalized advantage based on white attitudes, culture and history. Despite the fact that Bowman had worked at CESA 8 less than a year,

---

[5] Bowman consistently portrays the "Indian shit" comment (which was not even uttered by Jones) as showing racial animus. Although not material to the outcome here, it should be noted that a co-worker can be "sick" of receiving information about Native American topics without necessarily being a racist. A complaint over being inundated with Native American material is not the same as discriminatory animus toward Native Americans. Without knowing anything about the nature and quantity of articles Kaliebe was receiving it is difficult to conclude that her comment, let alone Jones' nonverbal response, constitutes evidence of a racist attitude. In other words, though Bowman subjectively may have believed that Jones and others had racial animus toward Native Americans, there is remarkably little evidence of this in the record.

11

Bowman's memo proceeded to indict Jones for a "seventeen year path of destruction" in which Jones, a "hurtful human being," "destroyed the careers, reputation and spirit of many people." (*Id.*) The memo then set forth, in chart form, a series of instances in which Bowman perceived meanness or inappropriate behavior on the part of Jones. The only incident that had any reference to race, however, was Jones' previously described response ("nodding her head and smiling knowingly") to Kaliebe's crude comment about being tired over the amount of material on Native Americans that Bowman was sending them.

In response to this memo, Kellogg informed Bowman that he had hired a private firm, Attorney Process and Investigation Service, Inc. ("API"), to investigate her allegations; he also emphasized to her that CESA 8 would not tolerate retaliation and asked her to alert him if she felt Jones or anyone else at the agency was retaliating or otherwise treating her adversely. (Kellogg Aff., Ex. M.) The API investigators interviewed nine individuals (including Wittrock, Kuck, Kaliebe, and Bowman), reviewed several documents, and then completed a thirty-page report on September 14, 2000. (Kellogg Aff., Ex. N at 1-30.) Kuck reported to the investigators that she had not heard Jones make any racist remarks and had only seen her silently agreeing with the "Indian shit" comment. (*Id.* at 18.) Other witnesses reported instances wherein Jones was difficult to work with, made rude comments about others, or was critical of other staff.

After viewing the report, Kellogg concluded that while Jones had acted unprofessionally and had been rude, abrupt, and inappropriately critical in dealing with certain co-workers, she had not engaged in discriminatory or racially motivated conduct. (Kellogg Aff., Ex. O at 31; *see also* Kellogg Aff., Ex. P at 32.) Taking into consideration Jones' long years of service at CESA 8 and the fact that she had never before been disciplined, Kellogg issued Jones a written reprimand and, with the BOC's approval, ordered a mediation procedure to address the relevant personnel conflicts.

12

(Kellogg Aff., ¶ 59, Ex. O at 31; Erdmann Aff. ¶¶ 9, 10.)  He also sent Bowman a letter on September 28, 2000, to inform her of the disposition of her July 2000 complaint against Jones. (Kellogg Aff., Ex. P at 32.)  In that letter, Kellogg informed Bowman that he was taking disciplinary action against Jones, repeated that he would not tolerate any retaliation against Bowman for having brought the complaint, and asked her to let him know if she experienced same.  (*Id.*)

Just a few days before Kellogg informed Bowman how he was resolving her complaint, she indicated in an e-mail her belief that Kellogg had "the best interests of the agency in mind." (Bowman Dep. at 103; Haase Aff., Ex. 1032 at 7.)  However, on October 3, 2000, just a few days after learning that Kellogg would not be firing Jones, Bowman submitted a lengthy complaint to Kellogg describing how, in 28 separate incidents, she had been the victim of retaliation by Kellogg and Jones since July 13, 2000.  (Kellogg Aff., Ex. Q at 1-17.)  She confirmed her disappointment in the fact that Jones had not been fired: "Mediation is not enough," she concludes, and "Dr. Kellogg's disciplinary actions are not 'appropriate' regarding the investigation of Peggy Jones." (*Id.* at 8.)  She requested that CESA 8 consider "more severe" action against Jones, as well as Kaliebe,[6] including "termination."  (*Id.* at 9.)  Bowman later admitted that she wanted Kaliebe fired or removed from her office, and that she filed the second complaint because she was upset that Kellogg had not fired Jones.[7]  (Bowman Dep. at 128.)

_____

[6] In a separate memorandum to Kellogg on July 13, 2000 (the same day she complained to Kellogg about Jones), Bowman stated that although she would like to keep Kaliebe as her assistant, she would recommend a transfer to another department if Kaliebe's conduct and work did not improve.  (Kellogg Aff., Ex. S [Dkt. #70, Part 4 at 18].)

[7] Again, given that Bowman was a relative newcomer to CESA 8, her tone is remarkably nostalgic: "Help us return the spirit of teamwork back to the agency so we can live our Agency mission and not just talk about it."  (*Id.* at 1.)  Of course, Jones had been with the agency the entire time.

13

Because Kellogg was partly the subject of Bowman's retaliation complaint, he referred it to the BOC, which hired outside counsel (Attorney Dennis Rader) to conduct an investigation[8] as to the charges against Kellogg. The BOC also re-hired API, the firm that had investigated Bowman's first complaint, to conduct a supplemental investigation of the charges against Jones. Both reports were completed near the middle of November 2000. In his report, Rader noted that CESA 8 had "serious personnel problems due to a staff divided over personalities, departmental control, history and countless other factors," but one of his "clearest conclusions" was that Kellogg had not retaliated against Bowman in any way for her previous filing of a discrimination complaint. (Erdmann Aff., Ex. A at 22-23.) Rader also thought it was suspicious that Bowman filed her retaliation complaint immediately after she learned that Jones would not be fired and after Kellogg had told her to inform him if she experienced any retaliation. The BOC reviewed both reports, and concluded that Bowman's retaliation allegations against Jones were likewise not substantiated by any evidence. (Erdmann Aff. ¶ 18.) By a letter dated December 18, 2000, BOC President Erdmann informed Bowman of the BOC's disposition of her retaliation complaint and explained its reasoning. (Erdmann Aff., Ex. C at 1-2.) In that letter, Erdmann noted:

> Although it is clear that substantial problems exist between yourself (and other CESA employees) and Ms. Jones, neither Ms. Jones nor Ms. Kaliebe have [sic] ever been in a position to take any employment action against you.

> While the fact that certain employees may not have treated others with the appropriate level of professionalism, is a matter of concern, it is not retaliation. The vast majority of the retaliation allegations against Ms. Jones and Ms. Kaliebe were matters addressed in the first investigation and the Board concludes that no further action is warranted.

(*Id.*)

---

[8] Plaintiffs weakly suggest that the investigation was not meaningful because it was "controlled by CESA 8" and because Attorney Rader formerly worked with the firm that represented CESA 8. (Resp. to CESA 8's PFOF [Dkt. #89] ¶ 110.)

14

On October 3, 2000, the same day that Bowman submitted her retaliation complaint, she, Kuck, Wittrock, and several other CESA 8 program directors met with Kellogg to complain about Jones; some of them said they wanted her fired. (DPFOF ¶ 114.) At the meeting, Wittrock again raised issues of Jones' alleged fiscal mismanagement, and pressed for an investigation. In response to these concerns, the BOC retained CESA 8's accounting firm to conduct an investigation.

On November 7, 2000, Wittrock filed a grievance against Kellogg and Jones. She complained about Jones' management of various programs Jones was involved in as Director of Staff Development during the 1997-98 school year. ( Kellogg Aff., Ex. CC.) She also complained that Kellogg ignored her complaints about Jones during the 1998-99 school year. (Kellogg Aff., Ex. DD.) Kellogg responded to Wittrock's concerns directed at him in a memorandum dated December 5, 2000. (Kellogg Aff., Ex. EE at 14-17.) Wittrock's complaint as to Jones was taken up by the accounting firm, which also met with Wittrock, Bowman, Kuck, and others to hear their concerns about alleged fiscal mismanagement at CESA 8.

On November 30, 2000, the accounting firm completed its report and found no evidence of fiscal malfeasance by any CESA 8 employee; however, the report recommended that CESA 8 make a number of changes in its procedures to better manage its budgeting and fiscal programs. (Kellogg Aff., Ex. FF at 18-23.) As to the "double billing" issue, the report found as follows:

> Our review included the Joint District Inservice Day program held on September 28, 1998. During our examination, it was noted that the calculation of the net costs to be billed to participating districts included $1,763 of amounts financed by state or federal grants. This resulted in each district being billed slightly more than the actual net cost of the program.

(*Id.* at 23.)

Plaintiffs contend the accounting firm's investigation was inadequate in that CESA 8 kept it too narrowly focused. The accounting firm was asked to review whether selected financial

transactions adhered to standard internal accounting procedures and to review for potential recommendations to modify the existing procedures so as to increase internal control. (Kellogg Aff., Ex. FF at 1 at 19.) Plaintiffs sought to expand the focus of the investigation, but Kellogg would not do so until they provided him with substantial documentation to justify the expansion. (Wittrock Dep. at 203.) Apparently, no such documentation was ever produced, at least in Kellogg's view, and thus the investigation was never expanded.

The working relationship between Bowman and Kaliebe deteriorated in the latter half of 2000. On July 13, 2000, Bowman expressed to Kellogg her concerns about Kaliebe's work performance, but stated she would like to have Kaliebe continue working for her department. (Kellogg Aff., Ex. S.) In September 2000, Bowman again informed Kellogg of concerns she had regarding Kaliebe's work performance. Kellogg scheduled and then held a meeting with both women to discuss Kaliebe's work performance and areas where immediate improvement was needed. On October 10, 2000, Bowman asked Kellogg to transfer Kaliebe or terminate her employment. (Bowman Dep. at 159.) On October 18, 2000, Kaliebe sent Kellogg an e-mail, complaining that Bowman had suggested Kaliebe either needed to take Bowman's side in the outside investigation or risk losing her job. (Kellogg Aff., Ex. V; Bowman Dep. at 161.) Kellogg transferred Kaliebe and assigned part-time help to assist Bowman while she proceeded with hiring a permanent replacement. However, the strained relationship between Bowman and Kaliebe continued. Shortly after the transfer, Kaliebe reported that Bowman had removed a number of personal items when clearing out Kaliebe's workspace. Then Bowman complained in writing to Kellogg that Kaliebe had falsified documents and engaged in other inappropriate conduct, including slandering Bowman. (Haase Aff., Ex. 1043-1046.) Kellogg investigated Bowman's allegations of

16

Kaliebe's misconduct, which Kaliebe denied. Kellogg found the timing of the allegations suspicious (i.e., made so shortly after Kaliebe reported personal items missing), concluded they were unsubstantiated, and informed Bowman of his conclusion.

As mentioned earlier, Bowman and Kuck were each sent a preliminary notice of non-renewal on January 19, 2001. The preliminary notice of non-renewal indicated that they had the right to request a hearing on the potential non-renewal of their contracts, but neither requested such a hearing (likely because such preliminary notices were somewhat routine). On February 13, 2001, the Agency notified them that their employment contracts would not be renewed on account of insufficient contracts with member school districts for the upcoming school year. (Kellogg Aff., Ex. HH.) In late March 2001, Kuck filed a complaint with the Wisconsin Personnel Commission, and Bowman did likewise in early April 2001. These complaints were later transferred to the Wisconsin Equal Rights Division and then dropped by Bowman and Kuck to pursue the present litigation. As discussed in more detail below, Bowman and Kuck claim that CESA 8's stated reasons for not renewing their contracts and terminating their positions are pretexts, the true motivation being retaliation and/or discriminatory animus toward Native Americans.

Finally, after Jones' employment ended on June 30, 2001, CESA 8 hired her back, on a temporary basis, to complete a few projects. Kuck asserts that CESA 8 retaliated by hiring Jones instead of her, while Bowman asserts that some of the work Jones did at this time goes toward showing that CESA 8's stated motives for ending her employment were pretextual.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact

17

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

The plaintiffs allege the defendants retaliated against them for exercising their free speech rights. Bowman also claims discrimination on account of her race and Bowman and Kuck claim retaliation in violation of Title VII, as well as equal protection and due process violations. I turn first to the plaintiffs' First Amendment retaliation claims.

18

## I. Protection for Government Employee Speech

For many years "the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Connick v. Myers*, 461 U.S. 138, 143 (1983). However, that dogma has been qualified in important respects by the Supreme Court, which has made clear that "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1957 (2006). The prevailing doctrine attempts to achieve a balance between the speech rights of public employees and the obvious needs of governments, as employers, to manage those employees and the matters on which they speak out. "The problem in any case is to arrive at a balance between the interests of the [government employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568 (1968).

The Seventh Circuit has set forth a three-step inquiry for determining when a government employee's speech rights have been violated:

> In analyzing a First Amendment retaliation claim brought under § 1983, we apply a three-step test premised on the Supreme Court's decisions in *Pickering, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977), and *Connick v. Myers,* 461 U.S. 138 (1983). First, we must determine whether the plaintiff's speech was constitutionally protected.

*Cygan v. Wisconsin Dept. of Corrections,* 388 F.3d 1092, 1098 (7th Cir. 2004). The first inquiry is multifaceted and asks, under *Connick*, whether the employee was speaking as a citizen on a

19

matter of public concern. If so, a court then must undertake the *Pickering* balancing test, "balancing the employee's interest in commenting upon such matters and the employer's interest in efficient public services." *Cygan,* 388 F.3d at 1098 (citing *Pickering,* 391 U.S. at 568)). If the speech was constitutionally protected, a court next determines, at step two, whether the speech caused—or at least played a substantial part in—the employer's decision to take the adverse action. *Vukadinovich v. Bd. of School Trustees*, 278 F.3d 693, 699 (7th Cir. 2002); *Spiegla v. Hull*, 371 F.3d 928, 942-43 (7th Cir. 2004) (citation omitted). If so, a court determines, in step three, whether defendants can show that they would have taken the same action in the absence of plaintiff's exercise of First Amendment rights. *Vukadinovich*, 278 F.3d at 699.

The Supreme Court has recently provided additional guidance as to when a public employee is speaking as a citizen for First Amendment purposes. In *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1959-60 (2006), the Court considered a First Amendment retaliation claim where the relevant speech was a memorandum from a deputy district attorney (Ceballos) to his supervisors that raised concerns about misrepresentations contained in a search warrant affidavit. Ceballos' employer reassigned him to a trial deputy position, transferred him to another courthouse, and denied him a promotion; not surprisingly, Ceballos alleged these acts were retaliatory. *Id.* at 1956. The Court found that Ceballos did not speak as a citizen, the controlling factor being that Ceballos' memorandum was written pursuant to his duties as a deputy district attorney. *Id.* at 1959. In light of this finding, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. The Court concluded Ceballos was not speaking as a citizen because he was merely discharging his

20

professional responsibilities when he wrote his recommendation memorandum. *Id.* The Court went on: "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*

In the wake of *Garcetti*, the threshold inquiry is whether the public employee was speaking as a citizen or, by contrast, pursuant to his duties as a public employee. *Sigsworth v. City of Aurora, Illinois*, 487 F.3d 506, 509-10 (7th Cir. 2007). As the Seventh Circuit has noted, *Garcetti* "significantly limits First Amendment protection of public employees' speech." *Salas v. Wisconsin Dept. of Corrections,* 493 F.3d 913, 925 n.8 (7th Cir. 2007). Only if a court determines the public employee was speaking as a citizen does it move on to determine whether the subject matter was one of public concern. *Id.* Whether an employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 146; *see also Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

Because both parties in *Garcetti* agreed that the plaintiff's speech was made pursuant to his official duties, the Court "had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 126 S. Ct. at 1961. Nevertheless, the *Garcetti* Court did provide some guidance. The inquiry is to be a "practical one" and should focus on "the duties an employee actually is expected to perform." *Id.* at 1962. At the same time, the Court cautioned that because expected duties can differ from formal job descriptions, "the listing of a given task in an employee's written job description is neither

21

necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 1963.

Again, the threshold inquiry a court must make, post-*Garcetti*, is whether the employee's speech is "the kind of activity engaged in by citizens who do not work for the government," *Garcetti*, 126 S.Ct. at 1962, rather than an activity undertaken in the course of performing one's job. Activities undertaken in the course of performing one's job are activities pursuant to official duties, and therefore, not constitutionally protected. *Id.* at 1960. Because the *Garcetti* Court did not articulate a comprehensive framework for defining the scope of employee's duties, that task has been taken up by lower courts. *See, e.g.*, *Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (finding unprotected speech when a police officer made negative remarks following an official meeting to discuss plans to reorganize the department because the remarks were made "in her capacity as a public employee contributing to the formation and execution of official policy"); *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) (holding as unprotected speech a prison guard's internal complaints documenting her superior's failure to respond to inmates' sexually explicit behavior toward her, but holding plaintiff acted as a citizen when she complained of same to her state senator and the Office of Inspector General); *Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (construing a university employee's report that alleged improprieties in her supervisor's handling and management of federal financial aid funds as "pursuant to her official employment responsibilities" and thus not protected speech).

### A. Wittrock

The defendants argue that Wittrock expressed her financial concerns as an employee, not a public citizen. Wittrock protests that she spoke as a citizen because her job (Staff Development

Director) did not require her to investigate or report the suspected "fraud" of Jones, Kellogg, and Quade. While true, this reflects a misreading of *Garcetti*. The central inquiry is whether Wittrock's speech was made "pursuant to" her job duties, not whether it was required by her job duties. Given the fact that "reporting fraud" is rarely within a government employee's specifically listed duties, Wittrock's reading of *Garcetti* would place an unwarranted limitation on its holding.

Here, I find that Wittrock's speech made during the 1998-99 school year concerning fiscal mismanagement at CESA 8 was made pursuant to her duties as Staff Development Director, and therefore is not entitled to First Amendment protection. Wittrock weakly objects to defendants' proposed finding that she administered the department's budget (Resp. to PPFOF ¶ 20), yet her own deposition testimony and the official job description (the latter of which Wittrock submitted into evidence) clearly show she bore significant responsibilities for preparing and overseeing her department's budget. (*See* Wittrock Aff., Ex. J; Wittrock Dep. at 31, 32, 37, 39, 40, 87, 187-88 (admitting to budget responsibilities as Staff Development Director)). Reporting financial irregularities within the department was therefore "pursuant to" her actual job duties. In other words, her communications to Kellogg and others were made as an employee, rather than "the kind of activity engaged in by citizens who do not work for the government." *Garcetti*, 126 S.Ct. at 1962.

But even this level of scrutiny as to Wittrock's particular job duties is not warranted. It is worth reiterating that the overarching question in retaliation cases is whether the government employee's important rights *as a citizen* are being infringed as a result of her decision to work for the government. *Connick,* 461 U.S. at 147. ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government.") When the very nature of the speech both arises out of one's position as an employee and the speech is communicated

solely through the channels provided by that employment, it is difficult to conclude that the plaintiffs were exercising their rights as citizens rather than fulfilling their duties as employees. For instance, in the recent case of *Phillips v. City of Dawsonville,* the Eleventh Circuit affirmed the dismissal of a former city clerk's claim that she had been retaliated against for highlighting the mayor's misuse of government funds for his own private use.

> Although her enumerated duties did not specify reporting misconduct by the Mayor, it was within her official duties to inquire about and make statements on the potentially inappropriate use of the City resources. Plaintiff's reports to other persons associated with the City government about Mayor Gilleland's breach of his own fiduciary duty to the City were pursuant to her official duties, given her position as both City Clerk and City Treasurer.

— F.3d —, 2007 WL 2593535, *3 (11th Cir. 2007); *see also Richards v. City of Lowell,* 472 F.Supp.2d 51, 80 (D. Mass. 2007) (fiscal manager's complaints about deposits of grant funds into special bank account not protected). The point is that speech which "owes its existence to a public employee's professional responsibilities" and is not communicated outside the employment chain of command is generally not protected speech. *Garcetti,* 126 S. Ct. at 1960.

That said, I further note that regardless of whether she was speaking as an employee or not, her speech may not even rise to a sufficient level of public concern. Naturally, Wittrock portrays herself as something of a whistleblower speaking out about "fraud" and "fiscal malfeasance" rather than mere financial irregularities within her department. (In fact, the term "malfeasance" appears some fifty times in her brief.) Obviously, financial malfeasance in a government agency can be a matter of public concern, *Spielga v. Hall,* 371 F.3d 928, 937 (7th Cir. 2004), and presumably it is one of the most important matters that a government employee can bring to light. But to call it "malfeasance" is to beg the question. The case she cites, *Spielga,* speaks of exposing

24

"unscrupulous" public employees and "wayward individuals," and it is telling that all of the cases cited in *Spielga* involved allegations that government employees were *stealing* money personally or abusing their positions for their own personal gain. *Id.* at 937. In fact *Spielga* is remarkable by contrast: the defendants there were alleged to be *smuggling contraband into a prison*. *Id.* at 933-34.

Here, despite Wittrock's repeated use of loaded and conclusory language, her present characterization of events strongly exaggerates the problems she was describing. The only figures in the record suggest that the "double billing" practice may have cost school districts a few extra dollars. The accounting report concluded that a total of $1,763 had been billed to the numerous member school districts that comprise CESA 8 for one in-service, resulting in a "slight" overcharge to the districts. She does not suggest that anyone was pocketing this money personally. Indeed, from her own brief, it is difficult to discern much about the actual nature of the "malfeasance" she is alleging, and it is well beyond the duties of a judge to scour the record and make out her case for her. *Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him. 'Judges are not like pigs, hunting for truffles buried in' the record.'" (quoting *Albrechtsen v. Board of Regents of University of Wisconsin System,* 309 F.3d 433, 436 (7th Cir.2002), cert. denied, 539 U.S. 941 (2003) (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991)).

Even so, review of the entire record does not provide much elaboration. In her deposition, Wittrock had some difficulty explaining not just the nature of her concerns but also the real-world import of those concerns. When pressed, she seldom had any concrete idea of how much money was at issue, and she seemed to have based many of her conclusions on verbal communications from various district employees.

25

Most telling, perhaps, is the impression her concerns made on others. When confronted with her concerns, Kellogg and Quade did not engage in a cover-up, stonewall or express anger – they merely shrugged. In fact, according to Wittrock herself, Quade looked into her complaint and found nothing of concern; she essentially seemed unmoved by Wittrock's complaints. (Wittrock Aff., ¶¶ 67, 60, 71.) Similarly, Kellogg simply didn't care, explaining (to the extent he conceded Wittrock's point) that "double billing" was a means of generating revenue for CESA 8. (Wittrock Aff., ¶ 77.) In a letter to Wittrock that she cites as damning evidence, Kellogg matter-of-factly states that he investigated her "double charging" concerns with Quade, learned there was "no policy" about it, and reiterated Quade's belief that it "could have been a way of generating cash flow for the staff development program. I told you that." (Wittrock Aff., Ex. M at 4.) In other words, although Kellogg and Quade clearly had a disagreement with Wittrock about the propriety of the matter, both were (as now) forthright about it and seemed content to put their opinions in writing and let the matter drop. If the purpose of First Amendment protections is to protect the speaker from those who might be offended by the speech and in a position to retaliate, that purpose is not served when the alleged retaliators simply express indifference to the speech rather than offense. Although such unconcern can (and does here) undermine the causation element of a retaliation claim, it also strongly hints that the speech itself was not significant enough to constitute a matter of public concern.

Ultimately, although the double billing practice "seemed wrong" to Wittrock, the determination of whether something is a matter of public concern is not subjective. The only inference one can draw from the record is that CESA 8 may have mis-allocated a few thousand dollars to fund certain educational programs at the expense of others, or funded one region's

26

offerings slightly more than another's. For various in-services (which occurred only rarely), CESA 8 apparently charged districts a "full" price even though it had funded a small portion of the costs through grants or other sources. Though clearly these were issues deeply important to Wittrock herself, the validity of her position is merely arguable rather than indisputable – after all, it was Wittrock's first and only year working as a CESA 8 director, and others with more experience took a different approach, a variation of the familiar "that's the way we do things" position that is difficult to conclude was wholly inappropriate, much less "malfeasant." Of course the merits of the dispute are beyond the scope of these proceedings, but it is clear that Wittrock's concerns – which do not allege embezzlement or law-breaking – merely involve the proper allocation of a small amount of education funds among various public educational entities.[9] In sum, I conclude that

---

[9] Plaintiffs all but concede that the amounts of money involved here were negligible, and they certainly provide no factual rebuttal of that characterization. (Pls. Br. at 25.) They cite *Rohr v. Nehls,* a case in which this court found that a whistleblower is protected "even if the whistle produces no sound." No. 04-C-477, 2006 WL 2927657 (E. D. Wis. 2006). That phrase is an allusion to the principle that an employee may not be retaliated against even if it later proves his complaint is mistaken or unfounded. The *act* of speaking out is protected. In this vein, plaintiffs seem to suggest that even if the issue was a minuscule one, they are nevertheless protected. But that principle does not mean a minuscule issue is a matter of public concern. Importantly, in *Rohr,* the defendant *conceded* the threshold issue of whether the issue was a matter of public concern. The question, instead, was whether the defendant's conduct was illegal or not. Ultimately, because it appeared the employers' actions were completely legal, the employee's attempt at whistleblowing proved largely misguided. Even so, the protection of the First Amendment extended to the *act* of whistleblowing – the employee had contacted the district attorney and county board chairman to make his complaint, and he could therefore not be retaliated against for speaking out. The plaintiff thus alleged he was retaliated against for the *act* of speaking out, not for the substance of his complaint.

Here, by contrast, the defendants are not explicitly trying to defend the "legality" of their actions in an effort to demonstrate that the plaintiffs' concerns were unfounded. Instead, their point is that even if the plaintiffs are correct, the issue is so technical and the amounts so negligible that they do not amount to a matter of public concern.

27

Wittrock's statements were made pursuant to her role as an employee and, even so, it is doubtful that they rose to the level of being a matter of public concern.

### B. There is no evidence of retaliation against Wittrock

Even if Wittrock was speaking out on a matter of public concern, she has failed to show any retaliation. To do so, she must also show (1) defendants took adverse employment action against her, and (2) there exists a causal link between her speech and the adverse action. *Mosely v. Bd. of Educ.*, 434 F.3d 527, 534 (7th Cir. 2006). In order to constitute retaliation for the exercise of First Amendment rights, the action complained of must be sufficiently adverse to deter the exercise of those rights. *Power v. Summers*, 226 F.3d 815, 820-21 (7th Cir. 2000). Furthermore, the adverse nature of the alleged action must rest on more than the plaintiff's subjective belief. *See Vukadinovich*, 278 F.3d at 700 (citation omitted).

Wittrock can point to no adverse actions that meet the standards for retaliation. As discussed below, most of Wittrock's allegations of retaliation are picayune or even patently frivolous, but I will make a few comments on the two that seem most substantial. The first of these is Wittrock's allegation that she was denied secretarial help during Kaliebe's maternity leave. Under the circumstances she alleges, an assistant's three month absence during maternity leave does not evidence retaliation. Wittrock's affidavit complains about working long hours during this period, but that is something millions of individuals do in similar situations; state agencies and businesses can hardly be expected to maintain a level of staffing that would allow full, seamless, support during lengthy staffing disruption.

Moreover, the facts do not support any inference of causation. Before Kaliebe took maternity leave, Wittrock signed an agreement under which Kaliebe was to continue doing some

28

of her tasks from home, (Haase Aff., Ex. 1009), and subsequently Kaliebe did work for Wittrock

from home. In addition, Kellogg provided Wittrock with the (apparently part-time) assistance of

two secretaries during Kaliebe's leave (Wittrock Dep. at 128, 136), and yet Wittrock still felt short-

staffed.[10]  A third person, Cindy Brown, was brought in to help Wittrock, but Wittrock ultimately

stopped using her, stating that she was threatened by Jones. (Wittrock Aff., ¶ 62.) Even if this *ad*

*hoc* assistance was as lackluster as Wittrock portrays it, it is simply too far-fetched, under these

facts, to claim that Kaliebe's maternity leave (which lasted only a few months) was part of some

calculated scheme to retaliate against Wittrock. In fact, the maternity leave was roughly

contemporaneous with – rather than after – Wittrock's efforts to complain to Kellogg and others

about financial matters. Ultimately, there is no evidence of a causal link between (1) Wittrock's

speech; (2) Kaliebe's pregnancy; and (3) Kellogg using the opportunity to retaliate. Of course

Wittrock does not go so far as to say Kaliebe herself planned her pregnancy to coincide with the

defendants' desire to retaliate, but when the claim of retaliation is based on a temporary staffing

matter outside the control of the defendants, it must have more support than the plaintiff's own

subjective perceptions.

   The second allegation worthy of comment is Wittrock's implied allegation that she was

forced to resign her position as Staff Development Director (and return to her post of program

support teacher). Here, too, however, Wittrock points to no specific evidence that would put a

material fact in dispute. Wittrock admits that during the 1998-99 school year, she was not

_____

[10] Based on Jones' past representations, Wittrock had expected specific individuals to assist her other than the two whose help was offered. (Wittrock Dep. at 125-134.) Clearly, however, Wittrock cannot contend she was given insufficient assistance merely because the assistance came from unexpected quarters.

suspended or disciplined, and did not have her duties or wages reduced. (*Id.* at 23, 25; DPFOF ¶¶ 67-69.) She also admits no one on CESA 8's BOC encouraged her to resign. (Wittrock Dep. at 178.) She contends, however, that Kellogg encouraged her to resign by facilitating or enabling Jones and Kaliebe to retaliate (*id.* at 177-78), and by stating during their January 1999 meeting that she seemed unhappy in her position and perhaps wanted to do something else. (*Id.* at 151.) And yet in the days between that January 1999 meeting and May 25, 1999, when she tendered her resignation,[11] Wittrock can point to no single incident that may have driven her to resign other than her job evaluation, which she considered "derogatory" and "a reprimand" (*id.* at 24), and an incident in which Kellogg expressed frustration at refereeing Wittrock's interactions with other staff members. (*See id.* at 151-54.) Beyond Wittrock's subjective interpretation of these matters, there is nothing here that would deter a person of ordinary firmness from exercising her free speech rights.

The rest of Wittrock's retaliation complaints illustrate the unusual, even desperate, nature of her case. She alleges a litany of minor slights, for example, Jones' "cold shoulder" treatment, Jones' interference with Wittrock's supervisory relationship with her assistant (Kaliebe), isolated negative comments by Jones and Kaliebe, Kellogg's memo requesting a meeting to discuss Wittrock's performance and her job-related frustrations, and Kellogg's memo to Wittrock's supervisor regarding the reasonableness of her purchase of a PDA (personal digital assistant).[12]

_____

[11] I note, too, that Wittrock's letter of resignation contains no hint of displeasure or pressure to resign; in fact, she states that she has "enjoyed" her work and "will be happy" to assist her replacement in the transition. (Kellogg Aff., Ex. H [Dkt. #70, Part 2 at 12].)

[12] Kellogg expressed to Wittrock's supervisor his belief that the device had unnecessary features and could have been purchased more cheaply from another source. (Kellogg Aff., Ex. PP.)

30

Actions such as these are so trivial that a person of ordinary firmness would not be deterred from expressing her right to free speech, *see, e.g., Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989), and thus are not retaliatory for purposes of stating a First Amendment claim under § 1983. In fact, the list of slights is arguably so mundane that it undermines Wittrock's argument: if the defendants wanted to retaliate, surely they could do better. I thus conclude that, even if true, none of these actions amounts to retaliation.

Moreover, as suggested earlier, some of Wittrock's allegations are so idiosyncratic that they call into question the entirety of her claims. In one case of alleged retaliation, for example, Wittrock stated that Kellogg "initially interfered" with her attempt to check out a projection device for a presentation she was giving. It turns out that this "interference" involved a phone call in which Kellogg: (1) stated that the device was checked out already; (2) asked her what she needed the device for; (3) asked her to hold for a minute, and then (4) stated that she could, in fact, have the device. This lasted, in Wittrock's own words, about two to three minutes. (Wittrock Dep. at 219-221.) Evidently, in Wittrock's view, even though she obtained the projector Kellogg was retaliating against her by not granting her request immediately.

Similarly unusual is Wittrock's claim that Kellogg was having her "watched" in retaliation for filing her grievance. The entirety of this claim is based on a single incident in which she purchased gasoline for a CESA 8 car using a CESA 8 credit card. The gas station attendant asked her for identification and, when she provided it, the charge was approved. (Wittrock Dep. at 224.) Because she had never been asked for ID before, she jumped to the conclusion that Kellogg was somehow behind the cashier's request for identification or involved in the electronic processing of her charge.

31

I have concluded that, even if true, none of Wittrock's claims are serious enough to constitute retaliation.  Additionally, however, the downright implausibility of the factual scenario Wittrock alleges suggests that retaliation was much more a perception than a reality.  "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  *Garcetti*, 126 S. Ct. at 1559 (quoting *Connick*, 461 U.S. at 154).  Accordingly, Wittrock's claim will be dismissed.

### C. Speech of Bowman and Kuck

As with Wittrock, Bowman's and Kuck's speech did not constitute speech on a matter of public concern.  Picking up on Wittrock's use of the term "malfeasance," Bowman asserted her belief that Jones was trying to "launder" money through CESA 8, and her concerns essentially echoed those of Wittrock.  (Bowman Aff., Ex. L.)  For instance, in a November 10, 2000 memo to Kellogg, Bowman stated she had "discovered some discrepancies with the Northern Joint [In-service] 2000 billing, which was handled by Betty Kaliebe.  Betty has been told numerous times to include revenue from other departments (i.e. Special Education, Departments, Grants) in this budget statement.  This additional revenue helps to defray costs for the districts.  Unfortunately, Betty chose not to include this in the billing for 1998, 1999 or 2000." (*Id.*, Ex. K.)   In other words, because the budget for the in-service did not reflect that other sources of funds existed, the individual districts were charged more than was actually necessary.

Similarly, in a July 26, 2000 memorandum to Kellogg, she summarized in abbreviated form several issues she had.  In the memo provided in evidence, two issues are highlighted (presumably in connection with this litigation) with a handwritten note suggesting that they "highlight fiscal favoritism to Peg [Jones] that started this whole mess at BTA [Bonduel Technical Academy]." (*Id.*

32

Ex. J.)  The first of these concerns she summarized was: "Fees paid from Bonduel to CESA 8 for administrative fees: S&A Dept - $1,000, $1,000 ITD Department, and $1,500 to PD Dept. (PD Dept. handles all administrative work; so why do other departments get this money?  What are their 'administrative' tasks"?)  The second issue she highlighted stated that "Contracts are paid from PD Dept to: $2,000 Pam K. (instructor), Connie $3,000 (co-director), Peg Jones $575 (what does she do? She didn't know when I asked her), Nicky $0."  (*Id.*)  Bowman indicated in the memo that she was not "comfortable with the ethical implications of this whole venture" and suggested that it needed a "serious evaluation from a planning, formative, and summative standpoint."  (*Id.*)

The content of Kuck's speech is even more difficult to describe, as the plaintiffs' briefs are notably elliptical about any particular expressions Kuck might have made.  In fact, the only concrete statement Kuck cites is not even her own: in April 2001, she "circulated" a letter written by another CESA 8 employee to board members of TEACH Wisconsin, a state agency involved in promoting technology in the classroom.  (Kuck Aff., ¶ 105.)  It is unclear, however, what, if anything, Kuck spoke out about apart from merely echoing the concerns expressed by Wittrock and Bowman.[13]  Her affidavit merely adds her belief that she was retaliated against for "opposing discrimination," but

---

[13] As an example, Kuck sets forth one of her concerns as follows:
A few months after the 2000 Bonduel Technology Academy Nicky showed me a copy of the contract written out to Connie Rutledge for $3000. I noticed that it had the money coming out of different project codes than the rest of the contracts, and used two separate codes, not just one like the rest of the contracts. I then reviewed the Academy budget and noticed that a contract to Peggy Jones was the only one being paid for by the Bonduel School District. I was immediately suspicious and on August 9, 2000, I requested from Sharon Quade a listing of all the project codes on the expenditure/revenue report list. Quade did not give me the list of project codes, but I eventually found them on a sheet in my paper files. My suspicions were confirmed when I saw that they were using Peggy's projects to pay for Connie's contract, and Connie's district to pay for Peggy's contract, realizing that this was a break in the pattern from any of the other instructor contracts for the BTA. (Kuck Aff., ¶ 28.)

33

she does not highlight any efforts she made (apart from a random email or group meeting) to engage in protected speech. (Kuck Aff., ¶ 63.)[14]

It is important to reiterate that, despite the plaintiffs' repetitive use of the loaded terms "malfeasance," "wrongdoing" and "laundering," no one is charging that any of the defendants actually stole money or appropriated it for non-academic purposes. Despite countless pages of briefing and affidavits, as well as review by investigators and accountants, the only impression one gets from the record is that Bowman and the other plaintiffs simply disagreed about the allocations and accounting of, at most, a few thousand dollars among various programs and districts. (Notably, the plaintiffs do not cite actual figures.)[15] Thus, though it is doubtful that the matters raised by the plaintiffs were issues of public concern, it is clear that Kuck and Bowman were speaking as employees rather than as citizens.[16] Accordingly, their First Amendment claims are dismissed as well.

## III. Title VII Retaliation Claims of Bowman and Kuck

In addition to alleging retaliation for protected speech, Bowman and Kuck bring claims of retaliation and discrimination under Title VII of the Civil Rights Act. Bowman claims the defendants discriminated against her because she is Native American, and both Bowman and Kuck

---

[14] Kuck's Title VII retaliation claim is discussed below. The defendants appear to concede that Kuck was engaged in protected activity, but it remains unclear what efforts Kuck took to "oppose discrimination," as she puts it.

[15] The only hint of actual wrongdoing is found in Bowman's affidavit, in which she states that another employee had personally benefitted by overbilling some $1,400. (Bowman Aff., ¶ 45.) There is no link between this incident and any protected speech or retaliation.

[16] Because I conclude their speech was not on a matter of public concern, I do not address their claims that the non-renewal of their contracts, as well as other acts, constituted retaliation. I consider retaliation under Title VII, a slightly different standard, below.

34

claim the defendants retaliated against them for speaking out against such discrimination. I will address their retaliation claims first.

**A. Title VII Retaliation**

Title VII prohibits an employer from retaliating against an employee who has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee can establish a prima facie case of retaliation by proceeding under either the direct or indirect method. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006). Under the direct approach, the employee must show evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). The direct method does not always require direct evidence. *Treadwell v. Office of Illinois Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006). "[C]ircumstantial evidence that is relevant and probative on any of the elements of a direct case of retaliation may be admitted and, if proven to the satisfaction of the trier of fact, support a case of retaliation." *Id.* (citing *Sylvester v. SOS Children's Villages of Illinois*, 453 F.3d 900, 902-03 (7th Cir. 2006)).

Alternatively, the employee may proceed under the indirect approach, which employs the familiar McDonnell Douglas burden-shifting analysis. *See McDonnell Douglas*, 411 U.S. 792, 802-04 (1973). Under this approach, plaintiff must show that he (1) engaged in statutorily protected activity; (2) was meeting the employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d at 728. If the plaintiff establishes a prima facie case, the employer must offer a legitimate, non-invidious reason for the adverse employment action; once the employer does this, the burden shifts back to the plaintiff to

35

demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

Plaintiffs proceed under the indirect method. The defendants concede that Bowman and Kuck were engaged in statutorily protected activity and that they were meeting the employer's legitimate expectations. However, the defendants contest the notion that the plaintiffs were treated less favorably than any similarly situated employee; they also argue that many of the acts the plaintiffs complain of do not rise to the level of adverse employment actions. Finally, to the extent the plaintiffs did suffer an undeniably adverse employment action (the non-renewal of their contracts), the defendants believe they have shown a non-pretextual reason for those actions that the plaintiffs cannot rebut.

### B. Failure to Renew Contracts

The principal act of retaliation cited by the plaintiffs is the loss of their jobs after their contracts were not renewed in 2001. Though the defendants make a cursory argument noting that many others received the same notice of non-renewal, they concede that only Kuck and Bowman (in addition to Jones) actually lost their jobs.[17] Thus, as to this claim it seems most fruitful to proceed immediately to the question of pretext.

To recall, Kuck and Bowman were sent preliminary notices of non-renewal on January 19, 2001. The letters stated that "[t]his action is necessary due to the absence of current contracted

---

[17] They do not assert, for example, that failing to *renew* a contract is different than actually terminating someone's employment. Similarly, the defendants raise, but do not press, the notion that the plaintiffs cannot make out a *prima facie* case of retaliation given that Jones herself, the *subject* of many of their complaints, had her contract non-renewed and soon left CESA 8 to become a school principal. The fact that Jones' contract was also non-renewed for the same reasons lends some support to CESA 8's stated reasons for non-renewal, although I do not conclude that it dooms the plaintiffs' *prima facie* case.

Case 1:02-cv-00818-WCG   Filed 10/17/07   Page 36 of 53   Document 108

agreements and funding from our school districts for the 2001-2002 school year." (Kellogg Aff., Ex. GG.) On February 13, 2001, CESA 8 notified them that their employment contracts would not be renewed on account of insufficient contracts with member school districts for the upcoming school year. (Kellogg Aff., Ex. HH.) But because similar letters were apparently sent to all department heads (given CESA 8's uncertainty about what funding would be available in the next school year), the real end of the employment relationship (the alleged adverse employment action) was signaled when the Board of Control met and unanimously decided to eliminate the three positions on June 7, 2001. (Erdmann Aff., ¶ 21.)

Lack of funding is surely a legitimate non-invidious reason for the failure to renew the plaintiffs' contracts, and so it falls upon the plaintiffs to suggest why the given reason is pretextual. The plaintiffs raise two arguments suggesting that the employer's reason is a pretext fabricated to shield its retaliatory purpose. Primarily, the plaintiffs argue that CESA 8 had plenty of funds to support the positions of Kuck and Bowman and thus they believe CESA 8's explanation rings hollow.

CESA 8, however, has provided ample, and ultimately dispositive, support for its claim that it had a financial reason for ending the employment relationship with Bowman and Kuck. According to Gerald Erdmann, a Tigerton School Board member who served as President of CESA 8's Board of Control at the time, by May 2001 it became clear that "there would be insufficient school district contracts available for the 2001-02 school year to continue with a Professional Development, Instructional Technology and Standards and Assessments programs with three full-time department heads and several support staff employees." (Erdmann Aff., ¶ 25.) (To recall, Instructional Technology was Kuck's department, Professional Development was Bowman's, and Standards and Assessments was run by Jones.)

Professional Development, according to Erdmann, had generated very little interest for the upcoming year. According to Exhibit E, attached to his affidavit, contracts for Instructional Technology dropped from an average of some $140,000 over the prior three years to only $37,489 in 2001-02. Professional Development contracts fell from roughly $70,000 to zero over the same period. In claiming pretext, the plaintiffs hint weakly that there was some sort of orchestrated movement to urge districts to cancel contracts. This is rebutted by affidavits filed by several district administrators, all of whom explain why they were not renewing contracts for these CESA 8 programs. Some cited personal reasons, including an assertion that both Bowman and Kuck were arrogant. (Polashek Aff., ¶ 4.) One claimed they were inflexible and unknowledgeable about their programs. (Christian Aff., ¶ 4.) Others viewed the programs as a "waste of time." (Kopitzke Aff., ¶ 5.) A more general trend was that the administrators realized they could perform the same types of services "in house," without spending money on CESA 8 programs, while other districts were forming other programming alliances outside of the CESA system. What all agreed on was that no one from CESA 8 had ever suggested that they not renew contracts with the plaintiffs' departments.

In any event, given the drop-off in demand for their services, Erdmann proposed to the Board of Control that it eliminate contracts for the directors of the three departments at issue. This was reflected in the agenda for the June 7 meeting, and the Board ultimately resolved to eliminate the positions of Jones, Bowman and Kuck. According to the minutes of the meeting, the motion to eliminate the positions was made by board member David Majewski, and was seconded by Larry Statezny. (Erdmann Aff., Ex. I at 4.) The entire resolution the board approved is as follows:

> WHEREAS, the school districts served by CESA 8 have submitted their contracts
> for CESA 8 services for the 2001-2002 school years;

WHEREAS, the Professional Development and Instructional Technology programs have seen a drop of 70% or more of the contracts subscribed for the 2001-2002 school years, than such programs had for the 2000-2001 school year.

WHEREAS, the Standards and Assessment program has been offered to school districts, but no district has subscribed to such program.

Based on the minimal amount of contracts for the PD, IT and SA programs, the Board of Control finds as follows:

1. There are not a sufficient number of school districts that have signed up for Professional Development, Standards and Assessment and Instructional Technology programs for the 2001-2002 school year, to justify a continuation of the positions of Director of Professional Development, Director of Standards and Assessment and Director of Instructional Technology.

2. That the decline of contracts for such programs means there will be a lack of work and funds available to justify issuance of contracts to those directors for the 2001-2002 school year.

3. That any carryover monies from such programs should be held in reserve to determine whether it is necessary to refund a portion of said monies to the school districts and/or use it to strengthen the programs purchased by school districts; and/or whether to hold such money in reserve to cover administrative expenses.

Based on such findings, the Board of Control of CESA 8 resolves that the positions of Director of Professional Development, Director of Standards and Assessment and Director of Instructional Technology shall be and hereby are eliminated. The Board of Control further directs the Agency Administrator, Dr. Robert Kellogg, to develop a plan which addresses the districts which have signed up for IT, PD and Standards and Assessment programs, to review and make a report to the Board of Control as to whether any of the carryover monies from the eliminated programs will be returned to local school districts, and to implement any necessary reduction in force of support staff caused by the elimination of three program director positions.

(Erdmann Aff., Ex. 8.)

In the face of undeniable evidence that demand for their service had dried up, as well as the fact that the resolution was sponsored and passed by individuals seemingly having nothing to do with the internecine personnel disputes the plaintiffs raised in this case, Bowman and Kuck have

39

provided very little evidence of their own. First, they smear Kellogg and Quade as the source of the erroneous financial information received by the BOC. Given the involvement of the two individuals complicit in CESA 8's "fiscal malfeasance," it is no surprise (the plaintiffs contend) that they were able to cook the books to achieve their desired goal of firing the plaintiffs. This unwarranted assertion, accompanied by the desperately conspiratorial assertion of a "pattern of lies," finds no support in the record and is surely no substitute for actual evidence. (Pls. Br. at 40-42.) In fact, when one strips the overheated invective away from the plaintiffs' argument, it is downright striking for its absence of evidence.

First, the plaintiffs do not dispute that there was almost no continuing demand for their services and that their departments would thus have had no work to do in the upcoming school year. Their argument seems to be that the BOC should have considered funding their positions through other means. For instance, having become aware that the Board was considering eliminating their positions, on June 5, 2001 Bowman and Kuck sent a letter to the BOC members indicating their desire that CESA 8 dip into all the other funds that it had available to it. (Erdmann Aff., Ex. G.) They castigated Kellogg for refusing to allow their departments to be funded by other streams of revenue, including federal, state and local revenue and whatever other funds CESA 8 had at its disposal.

Yet even if CESA 8 was not going broke and had other funds available, nowhere do the plaintiffs suggest a reason the Board should have allowed them to continue working despite not having any work to do. In other words, even if their arguments about CESA 8's finances are taken at face value, as the Board concluded, there was simply almost no demand for the plaintiff's services in the upcoming year. Why was it incumbent upon the BOC to fund sinecures for the plaintiffs?

40

CESA 8 has cited a patently legitimate reason for failing to renew the plaintiffs' contracts, and the plaintiffs' suggestion that CESA 8 could have funded their positions from other sources simply fails to rebut that reason.

The plaintiffs' second argument that CESA 8's stated reasons are pretextual is based on Kuck's overhearing of an April 5, 2001 conversation. Kuck states that, while sitting outside Kellogg's office,

> I heard one individual at the meeting inform the others that there were two ways they could attempt to justify terminating Bowman and me. He said, "How we terminate them is tricky" but that they could try to justify termination based on alleged job incompetence or they could wait until all the district contracts came in and assert that there was insufficient funding for our positions.

(Kuck Aff., ¶ 66.) Kellogg then allegedly stated that it would be "cleaner" if they waited until all the contracts came in before terminating Bowman and Kuck.

The defendants protest that this conversation with counsel was privileged and cannot constitute evidence in opposition to their motion for summary judgment. There is also some suggestion that Kuck was purposely eavesdropping. (Dickert Aff., ¶ 9.) The plaintiffs portray the conversation as a smoking gun showing that CESA 8 was out to fire them two months before it was clear that there was no demand for their services. Yet what the conversation reveals – if anything – is that the employer knew it would have additional, legitimate, grounds to terminate Bowman and Kuck (as well as Jones) very soon once it became clear that there were few contracts for their departments. It would thus be "cleaner" to wait. The overheard conversation thus merely suggests that there was another reason for the desire to terminate the plaintiffs in addition to the legitimate reason described above – it does not suggest that the employer's stated reason was pretextual, i.e., *false*.

41

For example, in *Crawford v. City of Fairburn, Ga.,* the plaintiff alleged retaliation and the employer responded by citing multiple legitimate reasons for the plaintiff's termination. 482 F.3d 1305, 1308 (11th Cir. 2007). The plaintiff responded with evidence that the employer was upset about questions he had raised that opened up a "can of worms" which could get the employer sued. *Id.* The plaintiff pointed to this evidence as though it rebutted the employer's proffered reasons, but the Eleventh Circuit rejected his effort. The evidence of alternative reasons for the termination, the court held,

> do[es] not raise questions about the truthfulness of any of the proffered reasons. Viewed in the light most favorable to Crawford, they suggest a retaliatory animus, but they do not respond to the explanation of the City that Crawford's performance was unsatisfactory in four other areas of his responsibility.
>
> Crawford erroneously argues that evidence of a discriminatory animus allows a plaintiff to establish pretext without rebutting each of the proffered reasons of the employer. The cases he cites for this proposition are inapposite, because in each case the plaintiff presented evidence that directly rebutted the proffered reasons of the employer.

*Id.* The argument here is even weaker. Nothing in the overheard conversation suggests retaliatory animus. The only question under consideration was whether to terminate Bowman and Kuck because they were incompetent or non-renew their contracts when, as expected, none of the school districts contracted for their services. Kellogg apparently thought, assuming the conversation occurred, that the lack of interest in their programs would be less subject to dispute when the inevitable challenge to the BOC's decision arose. Thus, even if one indulges the plaintiffs' own interpretation of the overheard conversation, the conversation does not speak to the truthfulness of CESA 8's proffered reason. The evidence, such as it is, is merely suggestive of the fact that CESA 8 had *additional* reasons to terminate the plaintiffs' employment.

Although the failure to rebut the employer's stated reason disposes of the matter, I note that there seems little reason to interpret the conversation as evidence of the employer's prohibited

motive to retaliate. First, the plaintiffs gloss over the fact that Jones' position was also terminated. Not only did Jones not engage in protected activity, she was the *source* of many of the plaintiffs' own complaints. If CESA 8 were actually intent on retaliating against Bowman and Kuck for their complaints about Jones, it makes little sense for CESA 8 to also fire Jones – one would expect instead that the alleged retaliator would at least be somewhat sympathetic to the subject of the plaintiff's complaints.

Second, it is not difficult to envision why CESA 8 wanted to end its relationship with Bowman and Kuck. After reviewing the record of this case, one gets the impression that CESA 8 could not continue fostering such a poisonous work environment. No doubt Dr. Kellogg was spending an inordinate amount of time acting as an employee "referee" rather than catering to the bona fide educational needs of the students under CESA 8's watch. Notably, as the affidavits of several district administrators note, these internecine personality disputes became grist for the rumor mill and distracted people from their actual educational duties. It is thus much easier to conclude that CESA 8 had simply grown disillusioned with Bowman and Kuck than it is to believe it sought to punish them for protected activity.[18]

### C. Miscellaneous Allegedly Retaliatory Acts

Although the failure to renew their contracts is the primary act of alleged retaliation, Kuck and Bowman also point to numerous other acts which, in their view, constituted retaliation under Title VII. These allegations fare little better.

---

[18] Plaintiffs do not argue that this is a "mixed motive" case, i.e., one in which the employer might have a legitimate reason for terminating an employee but nevertheless is actually motivated by prohibited reasons. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003). In any event, it seems likely that the evidence the defendants provide would have been sufficient to show that CESA 8 would have terminated plaintiffs' employment regardless of any protected activity.

43

In order to constitute retaliation, it is not enough to rely on the "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern and Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2409 (2006). Instead, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* Moreover, Title VII does not provide relief against individual employees – a plaintiff may succeed only when the actions of the employees are essentially those of the employer itself, either when the employee influences the employer's retaliatory act, *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir.1997), or when the employee is herself in a supervisory capacity. *Doe v. Oberweis Dairy,* 456 F.3d 704, 716 (7th Cir. 2006).

Bowman and Kuck allege a series of apparently isolated instances in which Kellogg or Jones retaliated against them. Bowman alleges that Kellogg withheld her performance evaluation for eight months; he "authorized" the release of confidential information from Bowman's complaint to Jones; he required Bowman and Kuck to attend mediation with Jones; and he ultimately failed to issue anything more than a letter of reprimand to Jones. Later, Kellogg "ordered" the removal of support staff and furniture from their departments and then required them to do busywork assignments. As for Jones, she "removed" Kuck from the GOALS 2000 committee, and she threatened and intimidated Bowman.[19]

I first note that the adverse nature of many of these actions is apparent neither from common experience nor from the plaintiffs' briefs. The briefs merely cite a laundry list of events and leave

_____

[19] I use quotation marks because these are the verbs the plaintiffs use. Reference to their own affidavits, however, indicates a much murkier picture. In some cases, the artful verbs used in the briefs completely contradict the evidence the plaintiffs themselves provide.

44

it for the court to guess why such actions, which are heavily contextual, involve a level of adversity that would dissuade a reasonable employee from engaging in protected activity.

Nor do the claims find support from materials in the record. As for the claims implicating Jones' activities, the plaintiffs do not make a case that the *employer* should be liable under Title VII. Jones, like Kuck and Bowman, was a director of a department, and the plaintiffs make little effort to show that their coworker's activities were somehow those of the employer itself. *Oberweis Dairy,* 456 F.3d at 717 ("The paradigmatic coworker is a worker of the same status as the plaintiff.") Although the plaintiffs perceive conspiracy and retaliatory intent everywhere within CESA 8, they make no concrete argument bridging the gap between Jones' alleged activities and the employer itself.[20]

---

[20] I also note that the substance of the claims against Jones is quite weak, and indeed one incident provides a vignette illustrating how a relatively pedantic workplace dispute has transmogrified into a federal case. The evidence regarding Kuck's "removal" from the GOALS 2000 committee is elaborated by Kuck's own emails on the subject. The problem arose when one of Kuck's pet projects on that committee (called "Training the Trainers") was canceled during a meeting she missed while on vacation. (Kuck Aff., Ex. H.) Kuck then became frustrated because Jones apparently did not forward her the minutes from that meeting. (It remains unclear why Jones was responsible for Kuck's participation on that committee or why Jones was responsible for sharing information with Kuck.) Instead of leaving it at that, Kuck sent a November 6, 2000 email to the entire GOALS 2000 board describing various thoughts she had as well as her desire to continue serving on the board. Kuck then made a hand-written note on the email (presumably for this litigation or for her attorney's benefit) stating that she was called into a meeting where Kellogg was angry she had written this email to the entire GOALS 2000 board. She responded that it was time the "truth" be exposed. She subsequently felt she had been removed from the committee because she did not receive communications or minutes from its meetings.

As far as the record goes, it seems Kuck was simply upset that Jones hadn't forwarded minutes from a meeting she missed, and this tiff developed into a dispute involving some twenty people (the recipients of Kuck's email). The denouement of what seems to be a fairly banal workplace dispute is now alleged to be "retaliation," requiring investigation by the defendants and consideration by this court, even though there is little indication that Jones was even involved in Kuck's "removal" from the committee in the first place.

45

The complaints involving Kellogg fare no better. For instance, Bowman claims her performance evaluation was withheld for eight months: "I was supposed to receive my performance evaluation from Kellogg in July 2000. However, he claimed that because of the investigation of Jones, he would not provide it to me. In fact, Kellogg did not give me my performance evaluation until March 2001, approximately 8 months after I was supposed to receive it." (Bowman Aff., ¶ 44.) This is the extent of the explanation given, however: there is no indication that the delay had any adverse effects on Bowman's employment. Moreover, Kellogg explained that he also withheld Jones' evaluation pending the outcome of the investigation.

In addition, Bowman complains that Kellogg released confidential information about her complaint to Jones, a fact Bowman surmised after Jones confronted Kuck in a parking lot. (Bowman Aff., ¶ 50.) Her own evidence, however, contradicts her brief and indicates that Kellogg was not involved; instead, Kellogg was "angry" that CESA 8's attorney provided the information to Jones. (Kellogg Aff., Ex. Q at 5.) Further, Bowman does not explain what "confidential" information had been released or how this was harmful – presumably at some point in a retaliation complaint the accused is going to learn the details of the complaint against her.

Bowman and Kuck also allege that Kellogg ordered support staff and equipment removed from their departments. In October 2000, Kellogg transferred Kaliebe from Bowman's department to Jones'. Kuck's personal assistant and webmaster was then removed, although Kaliebe was designated to help with web design work. (Kuck Aff., ¶¶ 39-42.) Kuck "estimated that this would cost my department an additional $7000 a year" because her budget would now have to be used to hire others to do the work. Yet even so, this was not a personal action against Kuck – the fact that her department's budget was slightly affected can hardly, in these circumstances, constitute the sort

46

of action that would chill protected activity. As for the transfer of Kaliebe from Bowman's department, it seems that Bowman herself *requested* that Kaliebe be transferred. Kellogg has explained that a replacement was soon found. (Supp. Kellogg Aff., ¶ 18.) These sorts of staffing hiccups do not rise to the level of retaliation, especially when the alleged victim is the underlying cause of the staffing shift to begin with. Finally, the plaintiffs' allegations that they had to perform "busywork" merely involve a few isolated incidents where they simply did not like the tasks they had to perform, some of which involved preparing reports "by hand." (Kuck Aff., ¶ 81.) None of these incidents rise to the level of retaliation.

In fact, review of the record demonstrates that Bowman, like Wittrock, has a profoundly different view of "retaliation" than the current state of the law forbids. For instance, as noted earlier, upon learning that Jones would not be fired Bowman created a chart listing "retaliation incidents." (Kellogg Aff., Ex. Q.) On this chart is found almost every imaginable slight or snub: emails that went unreturned, hostile attitudes, a student worker removed, and an employee quitting "because of" Bowman. In one "retaliation incident," Bowman complains that Kaliebe did not "get the Semester listings book done" despite "29 emails" from Bowman reminding her. When the two met with Kellogg, Kaliebe broke down in tears and Kellogg "reprimanded" Bowman for "bludgeoning" her. While many of these events have not made it into the plaintiffs' briefs, they underscore this court's conclusion that the genesis of this lawsuit seems to have involved nothing more than a string of perceived slights and personality clashes, none of which even approached the legal standard for retaliation. This was the conclusion set forth in Atty. Dennis Rader's report seven years ago, and subsequent years of discovery and litigation have not changed that fact. As Rader, who personally interviewed the individuals involved, stated in his November 2000 report:

It is possible for someone to successfully bring a retaliation claim without understanding the necessary elements of a retaliation claim since, whether a legitimate claim exists or not, [the claim] is dependent on the evidence. In this case, however, there is no evidence.

(Erdmann Aff., Ex. A at 3.)

## IV. Other Title VII Discrimination

Bowman also raises a claim under Title VII based on discrimination, rather than retaliation. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Bowman spends some energy arguing that her salary was "inequitable" from the outset and that subsequent raises she received were insufficient. In a free employment market, however, an equitable salary is simply any amount a given employer and employee can agree upon – there is nothing inherently "inequitable" in a particular salary when the employee is always free to reject the salary and find work elsewhere. Title VII does not impose some sort of grievance procedure for those unhappy with their salary; instead, to establish a *prima facie* case of discrimination, Bowman must establish that she was treated worse than a similarly situated member outside of the protected class. She points to her white predecessor, Wittrock, who earned some 20% more than Bowman was paid upon taking over. Wittrock, of course, had been with CESA 8 for some thirteen years, while Bowman was a new hire.[21] It is thus unclear why Bowman believes she should have stepped into the shoes of her predecessor's salary, but it is clear Bowman has cited no similarly situated white employees who

_____

[21] Moreover, unlike Wittrock, Bowman was given the use a CESA 8 vehicle and allowed to use it for travel to and from Madison where she was taking classes in pursuit of her doctorate. (Kellogg Supp. Aff. ¶ 2.)

48

were treated more favorably. As the Seventh Circuit has noted in the sex discrimination context, work experience is obviously a legitimate reason to discriminate in pay:

> [Plaintiff] has not established that she was paid less than a similarly situated male surgeon. Although Rosner was paid a higher salary, the record shows that Rosner worked at Family Health at least a year longer than Patt, and that Rosner had completed four years of post-residency work to Patt's two years at the time she was hired. . . . Years of service and prior experience are legitimate, non-discriminatory reasons for a wage disparity.

*Patt v. Family Health Systems, Inc.,* 280 F.3d 749, 752-53 (7th Cir. 2002). Here, Bowman's self-serving conclusions that she was essentially *more* qualified than Wittrock do not suffice to establish a *prima facie* case of discrimination.[22]

Bowman also weakly argues that Kellogg discriminated against her by "interrogating" her on one occasion about a proposed curriculum regarding the "Native perspective" on Thanksgiving. (Bowman Aff., ¶ 23.) On three other occasions, he denied Bowman's request to publish information related to Native American topics in the CESA 8 newsletter. (Bowman Aff., ¶¶ 25-28.) As with the disputes described earlier, these issues do not rise above the normal sorts of disputes one could be expected to have with one's employer. To constitute discriminatory treatment prohibited by Title VII, the actions must reach a level of significance that actually affects the fundamental nature of the employee's job. *Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004). Title VII's protections may be invoked when the employer's actions affect:

> (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to "humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in [her] work place environment."

---

[22] Moreover, Bowman ignores the fact that Kellogg supported her hiring in the first place.

49

*Lewis v. City of Chicago,* 496 F.3d 645, 653 (7th Cir. 2007) (quoting *Herrnreiter v. Chicago Hous.*

*Auth.,* 315 F.3d 742, 744-45 (7th Cir. 2002)).  Here, Kellogg's actions did not affect Bowman's

compensation or career prospects, and the fact that he may not have agreed with some of Bowman's

proposals certainly did not subject her to a "degrading" work environment.

### V. Due Process Claims of Bowman and Kuck

Additionally, Bowman and Kuck bring an essentially stillborn due process claim.  They

concede that CESA 8 complied with all of Wisconsin's statutory requirements regarding notice of

contract non-renewals.  *See* Wis. Stat. § 118.24(6) ("At least 4 months prior to the expiration of the

employment contract, the employing school board shall give notice in writing of either renewal of

the contract or of refusal to renew such person's contract."); Wis. Stat. § 118.24(7) ("Prior to giving

notice of refusal to renew the contract of any person described under sub. (1), the employing board

shall give such person preliminary notice in writing by registered mail at least 5 months prior to the

expiration of such contract that the board is considering nonrenewal of the contract . . .") Thus, the

plaintiffs recognize that due process has been met.  However, they protest that past practice had

been to send out proper notices in March rather than January.  By changing its practice to allow the

plaintiffs' contracts to expire two months earlier, CESA 8 "pulled the trigger too early," which the

plaintiffs cite as evidence that the defendants' stated reasons for terminating the contracts are

pretextual.

Because the plaintiffs concede that the defendants complied with due process, I will deem

any claim based on due process waived.  To the extent the plaintiffs now view the defendants'

compliance with due process to be evidence of pretext, such an argument lacks merit for the reasons

noted above.  The earlier timing of the non-renewal of Kuck's and Bowman's contracts does not

somehow imply that the employer's stated reasons for non-renewal are lies.

## VI. Bowman's Equal Protection Claim

Finally, Bowman alleges her right to equal protection of the laws was violated. In particular, she emphasizes the conduct of Jones, whom she describes as hostile to Native Americans through her use of racial slurs and distaste for Native American educational programs. (Bowman Aff., ¶¶ 41-43.) As hinted at earlier, Jones was a co-worker of Bowman and not in any position to retaliate against her. Similarly, an equal protection claim under § 1983 requires a defendant to be acting under color of law, and there is no indication here that Jones was acting in such a capacity. As the Seventh Circuit has summarized the law,

> When an equal protection claim is brought against an individual state employee, the plaintiff must show that the individual was acting under color of state law. "Action is taken under color of state law when it involves a misuse of power, 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' As a result, acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office."

*Valentine v. City of Chicago,* 452 F.3d 670, 682-83 (7th Cir. 2006) (citations omitted).

The requirement that an equal protection defendant be acting under color of law ensures that off-color remarks and personality disputes that may be typical among co-workers do not develop into constitutional claims merely because the individuals are public employees. Here, it is clear that Jones and Bowman were both CESA 8 directors under Dr. Kellogg's supervision, and Bowman does not really dispute this.[23] Jones was the director of standards and assessments, while Bowman was director of professional development. There is no evidence that Jones had any say in Bowman's salary, hours, or other conditions of her employment. As BOC president Erdmann noted

---

[23] Plaintiffs admit CESA 8's PFOF ¶ 13 to the extent that directors do not have supervisory functions over one another. They suggest without elaboration that directors might hold other titles that give them such authority. Dkt. #89, ¶ 13.

in responding to Bowman's retaliation complaint, "[a]lthough it is clear that substantial problems exist between yourself (and other CESA employees) and Ms. Jones, neither Ms. Jones nor Ms. Kaliebe have [sic] ever been in a position to take any employment action against you." In fact, Jones, like Bowman and Kuck, lost her contract at the same time they did, demonstrating that all three were equally subject to the programming desires of the various member districts. Bowman has simply not explained how Jones' various "slurs" were anything other than insults leveled by a co-worker, and there is thus no evidence that Jones was acting under color of state law when she allegedly made the remarks and expressed the hostility Bowman now complains of.[24] Thus, plaintiffs' claims against Jones have even less merit than their claims against the other defendants. Why she was named as a defendant in this action is, quite frankly, a mystery.

Bowman also raises an equal protection claim against Kellogg, but this will be dismissed for the same reasons she failed to establish a Title VII claim. *Hildebrandt v. Ill. Dep't of Natural Res.,* 347 F.3d 1014, 1036 (7th Cir. 2003) (same standards for proving intentional racial discrimination apply to Title VII and § 1983 equal protection claims.)

## CONCLUSION

Despite the explosive charges of financial malfeasance and racism leveled against them, all of the defendants complained throughout this litigation that the plaintiffs were simply trying to turn ordinary employment disputes into federal claims. Jones went further and suggested the plaintiffs

---

[24] This is not to concede that Jones' actions would have violated the Equal Protection Clause had she been acting under color of law. As Jones notes, many of Bowman's complaints are exceedingly vague.

were following a "throw it at the wall to see what sticks" theory of litigation. (Dkt. # 75 at 4.)[25] Either way, given that the charges had precipitated outside investigations by several impartial individuals several years ago, it should have been apparent long ago that the case lacked merit. Tellingly, despite the gravity of the allegations the plaintiffs provided no affidavits apart from their own, leaving conclusory assertions to do the heavy lifting. This is not a substitute for evidence, of course, and I thus conclude that plaintiffs have failed to demonstrate the existence of any material factual dispute that would justify prolonging this unfortunate dispute beyond the excessive period of time it has already been pending. Defendants are clearly entitled to judgment as a matter of law.[26]

**IT IS THEREFORE ORDERED** that defendants' motions for summary judgment are **GRANTED**. Plaintiffs' claims are dismissed, with prejudice.

Dated this ____16th____ day of October, 2007.


   _s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

---

[25] Perhaps in the education context it might better be called "No Claim Left Behind."

[26] In fact, it is hard to question Attorney Rader's suggestion that at least part of this case is based on a personal effort to get Jones fired rather than any actual retaliation or discrimination. (Erdmann Aff., Ex. A at 22.)

53